# SUPREME COURT OF THE UNITED STATES

No. 09A648

DENNIS HOLLINGSWORTH ET AL. *v.* KRISTIN M. PERRY ET AL.

ON APPLICATION FOR STAY

[January 13, 2010]

PER CURIAM.

We are asked to stay the broadcast of a federal trial. We resolve that question without expressing any view on whether such trials should be broadcast. We instead determine that the broadcast in this case should be stayed because it appears the courts below did not follow the appropriate procedures set forth in federal law before changing their rules to allow such broadcasting. Courts enforce the requirement of procedural regularity on others, and must follow those requirements themselves.

\* \* \*

This lawsuit, still in a preliminary stage, involves an action challenging what the parties refer to as Proposition 8, a California ballot proposition adopted by the electorate. Proposition 8 amended the State Constitution by adding a new section providing that "[o]nly marriage between a man and a woman is valid or recognized in California." Cal. Const. Art. I, §7.5. The plaintiffs contend that Proposition 8 violates the United States Constitution. A bench trial in the case began on Monday, January 11, 2010, in the United States District Court for the Northern District of California.

The District Court has issued an order permitting the trial to be broadcast live via streaming audio and video to a number of federal courthouses around the country. The

order was issued pursuant to a purported amendment to a local Rule of the District Court. That Rule had previously forbidden the broadcasting of trials outside the courthouse in which a trial takes place. The District Court effected its amendment via several postings on the District Court's Web site in the days immediately before the trial in this case was to begin.

Applicants here are defendant-intervenors in the lawsuit. They object to the District Court's order, arguing that the District Court violated a federal statute by promulgating the amendment to its local Rule without sufficient opportunity for notice and comment and that the public broadcast would violate their due process rights to a fair and impartial trial. Applicants seek a stay of the order pending the filing of petitions for writs of certiorari and mandamus. We granted a temporary stay to consider the issue further. *Post*, p. ___. Concluding that the applicants have made a sufficient showing of entitlement to relief, we now grant a stay.

I

Proposition 8 was passed by California voters in November 2008. It was a ballot proposition designed to overturn a ruling by the California Supreme Court that had given same-sex couples a right to marry. Proposition 8 was and is the subject of public debate throughout the State and, indeed, nationwide. Its advocates claim that they have been subject to harassment as a result of public disclosure of their support. See, *e.g.,* Reply Brief for Appellant 28–29 in *Citizens United* v. *Federal Election Comm'n*, No. 08–205, now pending before this Court. For example, donors to groups supporting Proposition 8 "have received death threats and envelopes containing a powdery white substance." Stone, Prop 8 Donor Web Site Shows Disclosure is a 2-Edged Sword, N. Y. Times, Feb. 8, 2009. Some advocates claim that they have received

confrontational phone calls and e-mail messages from opponents of Proposition 8, *ibid.*, and others have been forced to resign their jobs after it became public that they had donated to groups supporting the amendment, see Brief for Center for Competitive Politics as *Amicus Curiae* 13–14, in *Citizens United* v. *Federal Election Comm'n*, No. 08–205, now pending before this Court. Opponents of Proposition 8 also are alleged to have compiled "Internet blacklists" of pro-Proposition 8 businesses and urged others to boycott those businesses in retaliation for supporting the ballot measure. Carlton, Gay Activists Boycott Backers of Prop 8, Wall Street Journal, Dec. 27, 2008, A3. And numerous instances of vandalism and physical violence have been reported against those who have been identified as Proposition 8 supporters. See Exhs. B, I, and L to Defendant-Intervenors' Motion for Protective Order in *Perry* v. *Schwarzenegger*, No. 3:09–cv–02292 (ND Cal.) (hereinafter Defendant-Intervenors' Motion).

Respondents filed suit in the United States District Court for the Northern District of California, seeking to invalidate Proposition 8. They contend that the amendment to the State's Constitution violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution. The State of California declined to defend Proposition 8, and the defendant-intervenors (who are the applicants here) entered the suit to defend its constitutionality. A bench trial began on Monday, January 11, 2010, before the Chief Judge of the District Court, the Honorable Vaughn R. Walker.

On September 25, 2009, the District Court informed the parties at a hearing that there was interest in the possibility that the trial would be broadcast. Respondents indicated their support for the idea, while applicants opposed it. The court noted that "[t]here are, of course, Judicial Conference positions on this," but also that "[t]his is all in flux." Exh. 9, p. 72, App. to Pet. for Mandamus in No. 10–

70063 (CA9) (hereinafter App. to Pet.).

One month later, Chief Judge Kozinski of the United States Court of Appeals for the Ninth Circuit appointed a three-judge committee to evaluate the possibility of adopting a Ninth Circuit Rule regarding the recording and transmission of district court proceedings. The committee (of which Chief Judge Walker was a member) recommended to the Ninth Circuit Judicial Council that district courts be permitted to experiment with broadcasting court proceedings on a trial basis. Chief Judge Walker later acknowledged that while the committee was considering the pilot program, "this case was very much in mind at that time because it had come to prominence then and was thought to be an ideal candidate for consideration." *Id.*, Exh. 2, at 42. The committee did not publicly disclose its consideration of the proposal, nor did it solicit or receive public comments on the proposal.

On December 17, the Ninth Circuit Judicial Council issued a news release indicating that it had approved a pilot program for "the limited use of cameras in federal district courts within the circuit." *Id.*, Exh. 13, at 1. The release explained that the Council's decision "amend[ed] a 1996 Ninth Circuit policy" that had banned the photographing, as well as radio and television coverage, of court proceedings. *Ibid.* The release further indicated that cases would be selected for participation in the program "by the chief judge of the district court in consultation with the chief circuit judge." *Ibid.* No further guidelines for participation in the pilot program have since been issued.

On December 21, a coalition of media companies requested permission from the District Court to televise the trial challenging Proposition 8. Two days later, the court indicated on its Web site that it had amended Civil Local Rule 77–3, which had previously banned the recording or broadcast of court proceedings. The revised version of

Rule 77–3 created an exception to this general prohibition to allow "for participation in a pilot or other project authorized by the Judicial Council of the Ninth Circuit." *Id.*, Exh. 14. Applicants objected to the revision, arguing that any change to Ninth Circuit or local rules would require a sufficient notice and comment period.

On December 31, the District Court revised its Web site to remove the previous announcement about the change to Rule 77–3. A new announcement was posted indicating a "proposed revision of Civil Local Rule 77–3," which had been "approved for public comment." *Id.*, Exh. 17. The proposed revision was the same as the previously announced amendment. Comments on the proposed revision were to be submitted by Friday, January 8, 2010.

On January 4, 2010, the District Court again revised its Web site. The announcement regarding the proposed revision of Rule 77–3 was removed and replaced with a third version of the announcement. This third version stated that the revised Rule was "effective December 22, 2009," and that "[t]he revised rule was adopted pursuant to the 'immediate need' provision of Title 28 Section 2071(e)." *Id.*, Exh. 19, at 3.

On January 6, 2010, the District Court held a hearing regarding the recording and broadcasting of the upcoming trial. The court announced that an audio and video feed of trial proceedings would be streamed live to certain courthouses in other cities. It also announced that, pending approval of the Chief Judge of the Ninth Circuit, the trial would be recorded and then broadcast on the Internet. A court technician explained that the proceedings would be recorded by three cameras, and then the resulting broadcast would be uploaded for posting on the Internet, with a delay due to processing requirements.

On January 7, 2010, the District Court filed an order formally requesting that Chief Judge Kozinski approve "inclusion of the trial in the pilot project on the terms and

conditions discussed at the January 6, 2010, hearing and subject to resolution of certain technical issues." *Id.*, Exh. 1, at 2. Applicants filed a petition for a writ of mandamus in the Court of Appeals, seeking to prohibit or stay the District Court from enforcing its order. The following day, a three-judge panel of the Court of Appeals denied the petition.

On January 8, 2010, Chief Judge Kozinski issued an order approving the District Court's decision to allow real-time streaming of the trial to certain federal courthouses listed in a simultaneously issued press release. Five locations had been selected: federal courthouses in San Francisco, Pasadena, Seattle, Portland, and Brooklyn. The press release also indicated that "[a]dditional sites may be announced." Federal Courthouses to Offer Remote Viewing of Proposition 8 Trial, online at http://www.ca9.uscourts.gov/datastore/general/2010/01/08/ Prop8_Remote_Viewing_Locations.pdf (as visited Jan. 13, 2010, and available in the Clerk of Court's case file).

Chief Judge Kozinski's January 8 order noted that the request to broadcast the trial on the Internet was "still pending" before him. In a later letter to Chief Judge Walker, he explained that the request was not yet "ripe for approval" because "the technical staff encountered some unexpected difficulties preparing a satisfactory video suitable for on-line posting." Letter of Jan. 9, 2010 (available in Clerk of Court's case file). A final decision whether to permit online publication would be made when technical difficulties were resolved.

On January 9, 2010, applicants filed in this Court an application for a stay of the District Court's order. Their petition seeks a stay pending resolution of forthcoming petitions for the writs of certiorari and mandamus.

## II

The question whether courtroom proceedings should be

broadcast has prompted considerable national debate. Reasonable minds differ on the proper resolution of that debate and on the restrictions, circumstances, and procedures under which such broadcasts should occur. We do not here express any views on the propriety of broadcasting court proceedings generally.

Instead, our review is confined to a narrow legal issue: whether the District Court's amendment of its local rules to broadcast this trial complied with federal law. We conclude that it likely did not and that applicants have demonstrated that irreparable harm would likely result from the District Court's actions. We therefore stay the court's January 7, 2010, order to the extent that it permits the live streaming of court proceedings to other federal courthouses. We do not address other aspects of that order, such as those related to the broadcast of court proceedings on the Internet, as this may be premature.

## A

To obtain a stay pending the filing and disposition of a petition for a writ of certiorari, an applicant must show (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay. In close cases the Circuit Justice or the Court will balance the equities and weigh the relative harms to the applicant and to the respondent. *Lucas* v. *Townsend*, 486 U. S. 1301, 1304 (1988) (KENNEDY, J., in chambers); *Rostker* v. *Goldberg*, 448 U. S. 1306, 1308 (1980) (Brennan, J., in chambers). To obtain a stay pending the filing and disposition of a petition for a writ of mandamus, an applicant must show a fair prospect that a majority of the Court will vote to grant mandamus and a likelihood that irreparable harm will result from the denial of a stay. Before a writ of

mandamus may issue, a party must establish that (1) "no other adequate means [exist] to attain the relief he desires," (2) the party's "right to issuance of the writ is 'clear and indisputable,'" and (3) "the writ is appropriate under the circumstances." *Cheney* v. *United States Dist. Court for D. C.*, 542 U. S. 367, 380–381 (2004) (some internal quotation marks omitted). This Court will issue the writ of mandamus directly to a federal district court "only where a question of public importance is involved, or where the question is of such a nature that it is peculiarly appropriate that such action by this court should be taken." *Ex parte United States*, 287 U. S. 241, 248–249 (1932). These familiar standards are followed here, where applicants claim that the District Court's order was based on a local rule adopted in violation of federal law.

## B

Given the importance of the issues at stake, and our conclusion that the District Court likely violated a federal statute in revising its local rules, applicants have shown a fair prospect that a majority of this Court will either grant a petition for a writ of certiorari and reverse the order below or will grant a petition for a writ of mandamus.

A district court has discretion to adopt local rules. *Frazier* v. *Heebe*, 482 U. S. 641, 645 (1987) (citing 28 U. S. C. §2071; Fed. Rule Civ. Proc. 83). Those rules have "the force of law." *Weil* v. *Neary*, 278 U. S. 160, 169 (1929). Federal law, however, requires a district court to follow certain procedures to adopt or amend a local rule. Local rules typically may not be amended unless the district court "giv[es] appropriate public notice and an opportunity for comment." 28 U. S. C. §2071(b); see also Fed. Rule Civ. Proc. 83(a). A limited exception permits dispensing with this notice-and-comment requirement only where "there is an immediate need for a rule." §2071(e). Even where a rule is amended based on imme-

diate need, however, the issuing court must "promptly thereafter afford . . . notice and opportunity for comment." *Ibid.*

Before late December, the court's Local Rule 77–3 explicitly banned the broadcast of court proceedings:

> "Unless allowed by a Judge or a Magistrate Judge with respect to his or her own chambers or assigned courtroom for ceremonial purposes, the taking of photographs, public broadcasting or televising, or recording for those purposes in the courtroom or its environs, in connection with any judicial proceeding, is prohibited. Electronic transmittal of courtroom proceedings and presentation of evidence within the confines of the courthouse is permitted, if authorized by the Judge or Magistrate Judge. The term 'environs,' as used in this rule, means all floors on which chambers, courtrooms or on which Offices of the Clerk are located, with the exception of any space specifically designated as a Press Room. Nothing in this rule is intended to restrict the use of electronic means to receive or present evidence during Court proceedings."

Notably, the Rule excepted from its general ban the transmittal of certain proceedings—but it limited that exception to transmissions "within the confines of the courthouse." The negative inference of this exception, of course, is that the Rule would have prohibited the streaming of transmissions, or other broadcasting or televising, beyond "the confines of the courthouse."

Respondents do not dispute that this version of Rule 77–3 would have prohibited streaming video of the trial around the country. But they assert that this is not the operative version of Rule 77–3. In a series of postings on its Web site, the District Court purported to revise or propose revisions to Local Rule 77–3. This amendment would have created an additional exception to Rule 77–3's

general ban on the broadcasting of court proceedings "for participation in a pilot or other project authorized by the Judicial Council of the Ninth Circuit." Exh. 14, App. to Pet. Respondents rely on this amended version of the Rule.

The amended version of Rule 77–3 appears to be invalid. In amending this rule, it appears that the District Court failed to "giv[e] appropriate public notice and an opportunity for comment," as required by federal law. 28 U. S. C. §2071(b). The first time the District Court asked for public comments was on the afternoon of New Year's Eve. The court stated that it would leave the comment period open until January 8. At most, the District Court therefore allowed a comment period spanning five business days. There is substantial merit to the argument that this was not "appropriate" notice and an opportunity for comment. Administrative agencies, for instance, "usually" provide a comment period of "thirty days or more." *Riverbend Farms, Inc.* v. *Madigan*, 958 F. 2d 1479, 1484 (CA9 1992); see *Petry* v. *Block*, 737 F. 2d 1193, 1201 (CADC 1984) ("[T]he shortest period in which parties can meaningfully review a proposed rule and file informed responses is thirty days").

To be sure, the possibility that some aspects of the trial might be broadcast was first raised to the parties by the District Court at an in-court hearing on September 25, some three months before the Rule was changed. The broadcasting, however, was prohibited under both Circuit and local rules at that time. The first public indication that the District Court intended to adopt a rule of general applicability came in its Web site posting on December 23. And even if Chief Judge Walker's in-court allusion to the possibility that the Proposition 8 trial might be broadcast could be considered as providing notice to the parties in this case—his statement that "[t]his is all in flux" notwithstanding—the disclosure falls far short of the "appropriate

public notice and an opportunity for comment" required by §2071(b). Indeed, there was no proposed policy on which to comment.

The need for a meaningful comment period was particularly acute in this case. Both courts and legislatures have proceeded with appropriate caution in addressing this question. In 1996, the Judicial Conference of the United States adopted a policy opposing the public broadcast of court proceedings. This policy was adopted after a multi-year study of the issue by the Federal Judicial Center which drew on data from six district and two appellate courts, as well as state-court data. In light of the study's findings, the Judicial Conference concluded that "the intimidating effect of cameras on some witnesses and jurors [is] cause for concern." Report of the Proceedings of the Judicial Conference of the United States 47 (Sept. 20, 1994).

In more than a decade since its adoption the Judicial Conference has continued to adhere to its position on the broadcast of court proceedings. While the policy conclusions of the Judicial Conference may not be binding on the lower courts, they are "at the very least entitled to respectful consideration." *In re Sony BMG Music Entertainment*, 564 F. 3d 1, 6 (CA1 2009). Before abandoning its own policy—one consistent with the Judicial Conference's longstanding views—it was incumbent on the District Court to adopt a proposed rule only after notice and an adequate period for public comment.

In dispensing with public notice and comment the District Court invoked the "immediate need" exception. 28 U. S. C. §2071(e). It did so through a Web site posting on January 4—prior to the expiration of the comment period—indicating that Rule 77–3 had been revised to permit participation in the Ninth Circuit's pilot program. These postings gave no explanation for invoking the exception. At trial the District Court explained that the

immediate need here was to allow this case to be broadcast pursuant to the Ninth Circuit's new pilot program. See Exh. 1, p. 11, Supp. App. to Response for Perry et al.

This does not qualify as an immediate need that justifies dispensing with the notice and comment procedures required by federal law. While respondents (the plaintiffs in the District Court) had indicated their approval of the plan, no party alleged that it would be imminently harmed if the trial were not broadcast. Had an administrative agency acted as the District Court did here, the immediate need exception would likely not have been available. See 5 U. S. C. §553(b)(B) (administrative agencies cannot invoke an exception to affording notice-and-comment before rulemaking unless the notice-and-comment procedures would be "impracticable, unnecessary, or contrary to the public interest"). In issuing its order the District Court relied on the Ninth Circuit Judicial Council's pilot program. Yet nothing in that program—which was not adopted after notice and comment procedures, cf. 28 U. S. C. §332(d)(1)—required any "immediate" revision in local rules. The Ninth Circuit Judicial Council did not purport to modify or abrogate the District Court's local Rule. Nor could it, as the Judicial Council only has the power to modify or abrogate local rules that conflict with federal law. See §332(d)(4) (permitting a circuit court council to modify a local rule that is "found inconsistent" with rules promulgated by the Supreme Court). No federal law requires that the District Court broadcast some of its cases. The District Court's local Rule, in addition, was not a conforming amendment to Ninth Circuit policy, because that policy does not require district courts to broadcast proceedings.

Applicants also have shown that irreparable harm will likely result from the denial of the stay. Without a stay, the District Court will broadcast the trial. It would be difficult—if not impossible—to reverse the harm from

those broadcasts. The trial will involve various witnesses, including members of same-sex couples; academics, who apparently will discuss gender issues and gender equality, as well as family structures; and those who participated in the campaign leading to the adoption of Proposition 8. This Court has recognized that witness testimony may be chilled if broadcast. See *Estes* v. *Texas*, 381 U. S. 532, 547 (1965); *id.*, at 591 (Harlan, J., concurring). Some of applicants' witnesses have already said that they will not testify if the trial is broadcast, and they have substantiated their concerns by citing incidents of past harassment. See, *e.g.,* Exh. K to Defendant-Intervenors' Motion (71 news articles detailing incidents of harassment related to people who supported Proposition 8). These concerns are not diminished by the fact that some of applicants' witnesses are compensated expert witnesses. There are qualitative differences between making public appearances regarding an issue and having one's testimony broadcast throughout the country. Applicants may not be able to obtain adequate relief through an appeal. The trial will have already been broadcast. It is difficult to demonstrate or analyze whether a witness would have testified differently if his or her testimony had not been broadcast. And witnesses subject to harassment as a result of broadcast of their testimony might be less likely to cooperate in any future proceedings.

The balance of equities favors applicants. While applicants have demonstrated the threat of harm they face if the trial is broadcast, respondents have not alleged any harm if the trial is not broadcast. The issue, moreover, must be resolved at this stage, for the injury likely cannot be undone once the broadcast takes place.

This Court also has a significant interest in supervising the administration of the judicial system. See this Court's Rule 10(a) (the Court will consider whether the courts below have "so far departed from the accepted and usual

course of judicial proceedings . . . as to call for an exercise of this Court's supervisory power"). The Court may use its supervisory authority to invalidate local rules that were promulgated in violation of an Act of Congress. See *Frazier*, 482 U. S., at 645–646; *id.,* at 652, 654 (Rehnquist, C. J., dissenting). The Court's interest in ensuring compliance with proper rules of judicial administration is particularly acute when those rules relate to the integrity of judicial processes. The District Court here attempted to revise its rules in haste, contrary to federal statutes and the policy of the Judicial Conference of the United States. It did so to allow broadcasting of this high-profile trial without any considered standards or guidelines in place. The arguments in favor of developing procedures and rules to allow broadcast of certain cases have considerable merit, and reasonable minds can surely differ over the general and specific terms of rules and standards adopted for that purpose. Here, however, the order in question complied neither with existing rules or policies nor the required procedures for amending them.

By insisting that courts comply with the law, parties vindicate not only the rights they assert but also the law's own insistence on neutrality and fidelity to principle. Those systematic interests are all the more evident here, where the lack of a regular rule with proper standards to determine the guidelines for broadcasting could compromise the orderly, decorous, rational traditions that courts rely upon to ensure the integrity of their own judgments. These considerations, too, are part of the reasons leading to the decision to grant extraordinary relief.

In addressing a discrete instance authorizing a closed-circuit broadcast of a trial, Congress has illustrated the need for careful guidelines and standards. The trial of the two defendants in the Oklahoma City bombing case had been transferred to the United States District Court for the District of Colorado, so it was set to take place in

Denver. That meant the families of deceased and surviving victims in and around Oklahoma City would not have the opportunity to observe the trial. Congress passed a statute that allowed victims' families to watch the trial on closed-circuit television. 42 U. S. C. §10608. The statute was drawn with care to provide precise and detailed guidance with respect to the wide range of issues implicated by the broadcast. See §10608(a) (the statute only applies "in cases where the venue of the trial is changed" to a city that is "out of the State" and "more than 350 miles from the location in which those proceedings originally would have taken place"); §§10608(a)–(b) (standards for who can view such trials); §10608(c) (restrictions on transmission). And the statute gave the Judicial Conference of the United States rulemaking authority "to effectuate the policy addressed by this section." §10608(g). In the present case, by contrast, over a span of three weeks the District Court and Ninth Circuit Judicial Council issued, retracted, and reissued a series of Web site postings and news releases. These purport to amend rules and policies at the heart of an ongoing consideration of broadcasting federal trials. And they have done so to make sure that one particular trial may be broadcast. Congress' requirement of a notice and comment procedure prevents just such arbitrary changes of court rules. Instead, courts must use the procedures prescribed by statute to amend their rules, 28 U. S. C. §2071.

If Local Rule 77–3 had been validly revised, questions would still remain about the District Court's decision to allow broadcasting of this particular trial, in which several of the witnesses have stated concerns for their own security. Even districts that allow trials to be broadcast, see Civ. Rule 1.8 (SDNY 2009); Civ. Rule 1.8 (EDNY 2009), recognize that a district judge's discretion to broadcast a trial is limited, see, *e.g., Hamilton* v. *Accu-Tek*, 942 F. Supp. 136, 138 (EDNY 1996) (broadcast forbidden

unless "there is no interference with the due process, the dignity of litigants, jurors and witnesses, or with other appropriate aspects of the administration of justice"). Consequently, courts in those districts have allowed the broadcast of their proceedings on the basis that those cases were not high profile, *E*Trade Financial Corp.* v. *Deutsche Bank AG*, 582 F. Supp. 2d 528, 535 (SDNY 2008), or did not involve witnesses, *Marisol A.* v. *Giuliani*, 929 F. Supp. 660, 661 (SDNY 1996); *Katzman* v. *Victoria's Secret Catalogue*, 923 F. Supp. 580, 586–587 (SDNY 1996). Indeed, one District Court did not allow the broadcasting of its proceedings because the case "involv[ed] very sensitive issues." *Schoeps* v. *Museum of Modern Art*, 599 F. Supp. 2d 532, 534 (SDNY 2009). This case, too, involves issues subject to intense debate in our society. The District Court intends not only to broadcast the attorneys' arguments but also witness testimony. See *Sony BMG*, 564 F. 3d, at 11 (Lipez, J., concurring) (distinguishing broadcast of attorneys' arguments from other parts of the trial). This case is therefore not a good one for a pilot program. Even the studies that have been conducted thus far have not analyzed the effect of broadcasting in high-profile, divisive cases. See Application for Stay 17 (warning by Judge Edward R. Becker that in "'truly high-profile cases,'" one can "'[j]ust imagine what the findings would be'" (quoting Exh. 21, at 2, App. to Pet.)).

## III

The District Court attempted to change its rules at the eleventh hour to treat this case differently than other trials in the district. Not only did it ignore the federal statute that establishes the procedures by which its rules may be amended, its express purpose was to broadcast a high-profile trial that would include witness testimony about a contentious issue. If courts are to require that others follow regular procedures, courts must do so as

Per Curiam

well. The Court grants the application for a stay of the District Court's order of January 7, 2010, pending the timely filing and disposition of a petition for a writ of certiorari or the filing and disposition of a petition for a writ of mandamus.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 09A648

_____

## DENNIS HOLLINGSWORTH ET AL. *v.* KRISTIN M. PERRY ET AL.

ON APPLICATION FOR STAY

[January 13, 2010]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, dissenting.

The Court today issues an order that will prevent the transmission of proceedings in a nonjury civil case of great public interest to five other federal courthouses located in Seattle, Pasadena, Portland, San Francisco, and Brooklyn. The Court agrees that it can issue this extraordinary legal relief only if (1) there is a fair chance the District Court was wrong about the underlying legal question, (2) that legal question meets this Court's certiorari standards, (3) refusal of the relief would work "irreparable harm," (4) the balance of the equities (including, the Court should say, possible harm to the public interest) favors issuance, (5) the party's right to the relief is "clear and undisputable," and (6) the "question is of public importance" (or otherwise "peculiarly appropriate" for such action). See *ante*, at 6–7; *Rostker* v. *Goldberg*, 448 U. S., 1306, 1308 (1980) (Brennan, J., in chambers) (stay standard); *Cheney* v. *United States Dist. Court for D. C.,* 542 U. S. 367, 380 (2004) (noting that mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes" (internal quotation marks omitted)). This case, in my view, does not satisfy a single one of these standards, let alone all of them. Consequently, I must dissent.

*First*, consider the merits of the legal issue: The United States Code, in a chapter entitled "Rules of Courts," states

that "[a]ny rule . . . shall be prescribed only after giving appropriate public notice and an opportunity for comment." 28 U. S. C. §2071(b). The question here is whether the District Court accompanied the modification of its antivideo rule with "appropriate public notice and an opportunity for comment."

Certainly the parties themselves had more than adequate notice and opportunity to comment before the Rule was changed. On September 25, 2009, the trial judge, Chief Judge Vaughn Walker, discussed the possibility of broadcasting trial proceedings both within the courthouse and beyond, and asked for the parties' views. No party objected to the presence of cameras in the courtroom for transmissions within the courthouse, Exh. 9, p. 70, App. to Pet. for Mandamus in No. 10–70063 (CA9) (hereinafter App. to Pet.). ("No objection. None at all"), and both sides made written submissions to the court regarding their views on other transmissions. The court again raised the issue at a hearing on December 16.

Nor, in practice, did other members of the Judiciary lack information about the issue. In May 1996 the Circuit Council adopted a policy permitting video in connection with appellate proceedings, but prohibiting its use in the district court. Subsequently, appellate court panels have frequently permitted electronic coverage. Judges, the press, lawyers, and others have discussed the matter. In 2007 the lawyers and judges present at the Ninth Circuit Judicial Conference considered a resolution that favored the use of cameras in district court civil nonjury proceedings. And, voting separately, both lawyers and judges "approved the resolution by resounding margins." Letter from Chief Judge Kozinski to Judge Anthony Scirica (Jan. 10, 2010), Exh. 8, p. 4, Supp. App. to Response for Perry et al. (hereinafter Supp. App. to Response). Subsequently, a committee of judges was created to study the matter. And on December 17, 2009, the Circuit Council voted to

authorize a pilot program permitting the use of video in nonjury civil cases as part of an "experiment with the dissemination of video recordings in civil nonjury matters" (specifically those selected by the Chief Judge of the Circuit and the Chief Judge of the District Court). And it issued a press release. News Release, Ninth Circuit Judicial Council Approves Experimental Use of Cameras in District Courts (Dec. 17, 2009), Exh, 13. App. to Pet.

In this context the United States District Court for the Northern District of California amended its local rules on December 22, 2009 to bring them into conformity with Ninth Circuit policy. In particular, the court amended the local Rule forbidding the public broadcasting or televising of court proceedings by creating an exception "for participation in a pilot or other project authorized by the Judicial Council of the Ninth Circuit." Public Notice Concerning Revisions of Civil Local Rule 77–3, *id.,* Exh. 14. The court initially relied on a provision in the United States Code that permits District Courts to prescribe rules "without public notice and opportunity for comment" "[i]f the prescribing court determines that there is an immediate need for a rule," and if the court "promptly thereafter afford[s] such notice and opportunity for comment," 28 U. S. C. § 2071(e). See Exh. 1, at 11, Supp. App. to Response. Then, on December 31, the court revised its public notice to ask for comments directly. By January 8, 2010, the court had received 138,574 comments, all but 32 of which favored transmitting the proceedings. *Id.,* at 12.

Viewed in light of this history, the court satisfied the statute's insistence that "notice" be "appropriate." Cf. 28 U. S. C. §§2071(b), (e). The parties, the judges, and the interested public were aware of the proposals to change Ninth Circuit policy that culminated in the "pilot program" well before the change in the local rules that enabled participation in the project. The Ninth Circuit issued a press release in mid-December explaining its new

"pilot program." Then, once the District Court amended its local rule, it issued its own notice nearly three weeks before the transmissions that the rule change authorized were to begin. And the rule change itself is simply a change that conforms local rule to Circuit policy—a conformity that the law may well require. (The Judicial Council had long before voted to make its video policy "binding on all courts within the Ninth Circuit," Letter from Chief Judge Hug to All Ninth Circuit Judges (June 21, 1996) (available in Clerk of Court's case file); it announced its new "pilot program" policy in December 2009, App. to Application, Exh. 13, App. to Pet.; and federal statutes render district court rules void insofar as they have been "modified or abrogated" by the Council, see §2071(c)(1). Compare *ante*, at 11 ("Council only has the power to modify or abrogate local rules that conflict with federal law"), with 28 U. S. C. §332(d)(1) ("[C]ouncil shall make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit").) The applicants point to no interested person unaware of the change. How can the Majority reasonably demand yet more notice in respect to a local rule modification that a statute likely requires regardless?

There was also sufficient "opportunity for comment." The parties, the intervenors, other judges, the public—all had an opportunity to comment. The parties were specifically invited by Chief Judge Walker to comment on the possibility of broadcast as early as September. And the entire public was invited by the District Court to submit comments after the rule change was announced, right up to the eve of trial. As I said, the court received 138,574 comments during that time. How much more "opportunity for comment" does the Court believe necessary, particularly when the statutes themselves authorize the local court to put a new rule into effect "without" receiving *any* "comments" before doing so  when that *local* "court deter-

mines that there is an immediate need" to do so (and to receive comments later)? And more importantly, what is the legal source of the Court's demand for additional comment time in respect to a rule change to conform to Judicial Council policy?

*Second*, this legal question is not the kind of legal question that this Court would normally grant certiorari to consider. There is no conflict among the state or federal courts regarding the procedures by which a district court changes its local rules. Cf. this Court's Rules 10(a)–(b). The technical validity of the procedures followed below does not implicate an open "important question of federal law." Cf. Rule 10(c). Nor do the procedures below clearly conflict with any precedent from this Court. Cf. *ibid.*

It is particularly inadvisable for this Court to consider this kind of question because it involves local rules and local judicial administration. Here, for example, the Court decides just how a district court should modify its own local rules; in a word, this Court micromanages district court administrative procedures in the most detailed way. And, without briefing, the Court imposes limitations on the Judicial Councils' ability to implement policy decisions, *ante,* at 11–12 (suggesting Council policy does not abrogate local rules), with consequences we cannot predict. The District Councils, the Circuit Councils, the Judicial Conference of the United States, and the Chief Justice bear responsibility for judicial administration, not this Court. See 28 U. S. C. §§331–332. And those bodies have adequate authority to resolve disagreements about how to promulgate and apply local rules, and, particularly, about the use of cameras in the courtroom.

For the past 80 years, local judicial administration has been left to the exclusive province of the Circuit Judicial Councils, and this Court lacks their institutional experience. See generally P. Fish, The Politics of Federal Judicial Administration 152–153 (1973) (From their creation,

"[t]he councils constituted . . . a mechanism through which there could be a concentration of responsibility in the various Circuits—immediate responsibility for the work of the courts, with power and authority . . . to insure competence in th[eir] work . . .").  For that reason it is inappropriate as well as unnecessary for this Court to intervene in the procedural aspects of local judicial administration. Perhaps that is why I have not been able to find any other case in which this Court has previously done so, through emergency relief or otherwise.  Cf. *Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 264 (1988) (SCALIA, J., concurring) ("I do not see the basis for any direct authority to supervise lower courts" (citing *Frazier* v. *Heebe*, 482 U. S. 641, 651–652 (1987) (Rehnquist, C. J., dissenting))).  Nor am I aware of any instance in which this Court has preemptively sought to micromanage district court proceedings as it does today.

I recognize that the Court may see this matter not as one of promulgating and applying a local rule but, rather, as presenting the larger question of the place of cameras in the courtroom. But the wisdom of a camera policy is primarily a matter for the proper administrative bodies to determine.  See 28 U. S. C. §332.  This Court has no legal authority to address that larger policy question *except insofar as it implicates a question of law*.  The relevant question of law here concerns the procedure for amending local rules.  And the only relevant legal principles that allow us here to take account of the immediate subject matter of that local rule, namely cameras, are those legal principles that permit us—indeed require us—to look to the nature of the harm at issue and to balance equities, including the public interest. I consequently turn to those two matters.

*Third*, consider the harm: I can find no basis for the Court's conclusion that, were the transmissions to other courtrooms to take place, the applicants would suffer

irreparable harm. Certainly there is no evidence that such harm could arise in this nonjury civil case from the simple fact of transmission itself. By my count, 42 States and two Federal District Courts currently give judges the discretion to broadcast civil nonjury trials. See Media Privacy and Related Law 2009–10 (2009) (collecting state statutes and rules); Civ. Rule 1.8 (SDNY 2009); Civ. Rule 1.8 (EDNY 2009). Neither the applicants nor anyone else "has been able to present empirical data sufficient to establish that the mere presence of the broadcast media inherently has an adverse effect on [the judicial] process," *Chandler* v. *Florida*, 449 U. S. 560, 578–579 (1981). Cf. M. Cohn & D. Dow, Cameras in the Courtroom: Television and the Pursuit of Justice 62–64 (1998) (canvassing studies, none of which found harm, and one of which found that witnesses "who faced an obvious camera, provided answers that were more correct, lengthier and more detailed"). And, in any event, any harm to the parties, including the applicants, is reparable through appeal. Cf. *Chandler, supra*, at 581.

The applicants also claim that the transmission will irreparably harm the witnesses themselves, presumably by increasing the public's awareness of who those witnesses are. And they claim that some members of the public might harass those witnesses. But the witnesses, although capable of doing so, have not asked this Court to set aside the District Court's order. Cf. *Miller* v. *Albright*, 523 U. S. 420, 445 (1998) (O'Connor, J., joined by KENNEDY, J., concurring in judgment); *Powers* v. *Ohio*, 499 U. S. 400, 411 (1991). And that is not surprising. All of the witnesses supporting the applicants are already publicly identified with their cause. They are all experts or advocates who have either already appeared on television or Internet broadcasts, already toured the State advocating a "yes" vote on Proposition 8, or already engaged in extensive public commentary far more likely to

make them well known than a closed-circuit broadcast to another federal courthouse.

The likelihood of any "irreparable" harm is further diminished by the fact that the court order before us would simply increase the trial's viewing audience from the occupants of one courtroom in one courthouse to the occupants of five other courtrooms in five other courthouses (in all of which taking pictures or retransmissions have been forbidden). By way of comparison literally hundreds of national and international newspapers are already covering this trial and reporting in detail the names and testimony of all of the witnesses. See, *e.g.,* Leff, Woman Recalls Emotional Ordeal of Gay Marriage Ban, Associated Press, Jan. 11, 2010. I see no reason why the incremental increase in exposure caused by transmitting these proceedings to five additional courtrooms would create any further risk of harm, as the Court apparently believes. See *ante*, at 13. Moreover, if in respect to any particular witness this transmission threatens harm, the District Court can prevent that harm. Chief Judge Walker has already said that he would keep the broadcast "completely under the Court's control, to permit the Court to stop it if [it] proves to be a problem, if it proves to be a distraction, [or] if it proves to create problems with witnesses." See Exh. 2, at 45, App. to Pet. The Circuit Council confirmed in a press release that the District Court "will fully control the process" and that "Judge Walker has reserved the right to terminate any part of the audio or video, or both, for any duration" or to terminate participation in the pilot program "at any time." News Release, Federal Courthouses to Offer Remote Viewing of Pro-position 8 Trial (Jan. 8, 2010), http://www. ca9.uscourts.gov/datastore/general/2010/01/08/Prop8_ Remote_Viewing_Locations.pdf (as visited Jan. 13, 2010, and available in Clerk of Court's case file). Surely such firm control, exercised by an able district court judge with

20 years of trial-management experience, will be sufficient to address any possible harm, either to the witnesses or to the integrity of the trial.

*Fourth*, no fair balancing of the equities (including harm to the public interest) could support issuance of the stay. See *Times-Picayune Publishing Corp.* v. *Schulingkamp*, 419 U. S. 1301, 1305 (1974) (Powell, J. in Chambers) (recognizing "significant public and private interests balanced on both sides" when "present[ed with] a fundamental confrontation between the competing values of free press and fair trial"). As I have just explained, the applicants' equities consist of potential harm to witnesses— harm that is either nonexistent or that can be cured through protective measures by the District Court as the circumstances warrant. The competing equities consist of not only respondents' interest in obtaining the courthouse-to-courthouse transmission that they desire, but also the public's interest in observing trial proceedings to learn about this case and about how courts work. See *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539, 587 (1976) (Brennan, J., concurring in judgment); see also Exh. 2, at 42, App. to Pet. (statement of Chief Judge Walker) ("[I]f the public could see how the judicial process works, they would take a somewhat different view of it." "I think the only time that you're going to draw sufficient interest in the legal process is when you have an issue such as the issues here, that people think about, talk about, debate about and consider"). With these considerations in the balance, the scales tip heavily against, not in favor, of issuing the stay.

The majority's action today is unusual. It grants a stay in order to consider a mandamus petition, with a view to intervening in a matter of local court administration that it would not (and should not) consider. It cites no precedent for doing so. It identifies no real harm, let alone "irreparable harm," to justify its issuance of this stay. And the public interest weighs in favor of providing access

to the courts. To justify this extraordinary intervention, the majority insists that courts must "enforce the requirement of procedural regularity on others, and must follow those requirements themselves." *Ante*, at 1. And so too I believe this Court should adhere to its institutional competence, its historical practice, and its governing precedent—all of which counsel strongly against the issuance of this stay.

I respectfully dissent.