TALLMAN, Circuit Judge,
joined by RAWLINSON, BYBEE, CALLAHAN, M. SMITH, Circuit Judges,
concurring in part, dissenting in part, and concurring in the judgment denying habeas relief:
Part II of today’s opinion is an imprudent exercise of Article III judicial power. It is all the more so because the Supreme Court reversed our previous en banc decision in Frost’s case and held that the trial court’s restriction on Frost’s closing argument was not structural error as we had declared. Glebe v. Frost (Frost IV), — U.S. -, 135 S.Ct. 429, 431-32, 190 L.Ed.2d 317 (2014) (per curiam). The Supreme Court remanded the case, directing us to conduct a harmlessness analysis. See id. at 432 (“The Court of Appeals did not address [whether the state court was unreasonable ■ to find harmlessness] when sitting en banc, and it is not before , us today.... We reverse the judgment of the Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.”). In Part I, we now all agree that the. trial court’s error did not have a “substantial and injurious- effect or influence in determining the jury’s verdict” in light of the overwhelming evidence of Frost’s guilt for the numerous crimes he committed in his .eleven-day crime spree. Davis v. Ayala, — U.S. -, 135 S.Ct. 2187, 2198, 192 L.Ed.2d 323 (2015) (quoting O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)); see Maj. Op. at 471-72.
That should have been the end of the matter. The mandate should have issued promptly after affirming the district court’s denial of Frost’s petition for habeas corpus. Yet, Part II exceeds the Supreme Court’s remand instructions and now resurrects Frost’s procedurally defaulted Brady and Napue claims when three courts, including this same en banc panel, previously declined to certify Frost’s remaining claims 'for appeal. See Frost v. Van Boening (Frost I), No. C09-725Z, 2011 WL 486198, at *1-2 (W.D.Wa. Feb. 4, 2011) (denying a certificate of appealability as to claims 1, 2, and 4 of Frost’s amended habeas petition); Frost v. Van Boening (Frost II), 692 F.3d 924, 927 n. 3 (9th Cir.2012), superseded on reh’g en banc, 757 F.3d 910 (9th Cir.2014) (“Having considered Frost’s arguments, we are satisfied that none of his other claims meet [the standard to obtain a certificate of appealability].”); Frost III, 757 F.3d 910, 919 (9th Cir.2014) (en banc), (“[We] decline to expand the certificate of appealability.”).
All eleven judges on this en banc panel previously considered Frost’s procedurally defaulted claims. We could not have been more clear in our previous en banc decision. Frost III, 757 F.3d at 919. Frost did not file his own petition for certiorari challenging this ruling, and the Supreme Court did, .not grant certiorari on this issue. . Our decision not to expand the certificate of appealability to consider Frost’s procedurally defaulted claims is now the “law of the case,” and the majority errs by “reconsider[ing] an issue that has already been decided by the same court or a higher- court in the same case.” Gonzalez v. *479 Arizona, 677 F.3d 383, 390 n. 4 (9th Cir.2012), aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc., — U.S. -, 133 S.Ct. 2247, 186 L.Ed.2d 239 (2013). The majority’s untimely and injudicious attempt to rewrite history to now consider Frost’s Brady and Napue claims greatly “compromise^] the orderly, decorous, rational traditions that [we] rely upon to ensure the integrity of [our] own judgments.” Hollingsworth v. Perry, 558 U.S. 183, 197, 130 S.Ct. 705, 175 L.Ed.2d 657 (2010).
By my count, this is Frost’s fifth effort to collaterally attack what we all agree is a valid conviction for crimes committed in April 2003. This latest sua sponte “endless repetition of inquiry” into the facts surrounding Frost’s conviction disrupts congressional intent in enacting the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA) to conserve judicial resources, avoid piecemeal litigation, and eliminate delays in the federal habeas review process. See McCleskey v. Zant, 499 U.S. 467, 492, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); Gonzalez v. Thaler, — U.S. -, 132 S.Ct. 641, 650, 181 L.Ed.2d 619 (2012) (“Congress’s intent in AEDPA [was] ‘to eliminate delays in the federal habeas review process.’ ”) (quoting Holland v. Florida, 560 U.S. 631, 648, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010)).
Section II C of Judge Kozinski’s opinion — for which there is no majority:— launches a groundless, personal attack against several King County employees who have no way to defend themselves from the defamation. Judge Kozinski’s quiver is full, and Section II C of his “opinion” loosens several arrows directed at the King County Prosecutor’s Office and the Sheriffs Department. The attack in Section II C is mounted notwithstanding the ultimate conclusion that Frost still loses because he cannot establish prejudice from the revived constitutional violations. Article III of the United States Constitution is not a roving-commission .permitting federal judges to use their opinions as a platform to launch such ad hominem attacks, Section II C of Judge Kozinski’s opinion is not the judgment of this court.
I
The crux of Frost’s Brady and Napue claims is that the prosecutor knowingly elicited false testimony and suppressed impeachment evidence relating to a trial witness, Edward' Shaw. Prior to Frost’s arrest, Shaw had learned about Frost’s involvement in the robberies and reported this knowledge to law enforcement. At the. time of his meeting with law enforcement, Shaw had been charged-with: (1) unlawful possession of a firearm in the first degree and (2) possession for sale of a controlled substance (the “gun and drugs” case). Shaw asked the State for leniency on these two charges in exchange for information about Frost, but the State refused to make a deal. Shaw, nonetheless, told sheriffs detectives what he knew about Frost’s criminal activities.- Frost was arrested, incriminating evidence was seized, and he confessed (three times).
Shaw was subsequently charged with a third crime, second-degree assault with a deadly weapon stemming from a domestic violence incident (the “domestic violence” case). Before Frost’s trial,- Shaw entered into a plea' agreemént in the gun and drugs case. After trial, Shaw also pled to the domestic violence charge. The state agreed to reduce Shaw’s charges in the gun and drugs case in exchange for his testimony at Frost’s trial. In the space marked “Other” on Shaw’s gun and drugs plea agreement, dated November 3, 2003, the following was handwritten: “Testify truthfully in State v. Frost..as set forth in agreement. Plead guilty to 03-1- *480 02187-0 (domestic violence assault case).” Shaw’s plea agreement in the domestic violence case, also dated November 3, 2003, provides: “This plea is part of a two-case offer.” The State also recommended that Shaw’s nine-month sentence in the domestic violence case be imposed concurrently with the sentence imposed on the gun and drugs charges.
At Frost’s trial, Shaw testified about a conversation he had with Frost the night before Frost’s arrest. In this particular conversation, Shaw asked Frost whether he had committed the recent robberies in the area. Shaw testified that Frost “started giggling” in response. Shaw further testified that he was motivated to contact the police after this conversation “[because what they were doing was hot right; They beat old people, and after somebody gives them what they want they would shoot them. That is not right by me.” In addition, the prosecution introduced an unsigned version of the prosecution’s plea offer letter in the gun and drugs case, which did not reference Shaw’s domestic violence case. Shaw did not mention his domestic violence agreement at trial and also testified that the unsigned letter was identical to the offer letter that he had signed. Therefore, the details of Shaw’s domestic.violence agreement were never disclosed to Frost at trial. It was not until two. days after Frost’s conviction that Shaw’s plea agreement and the prosecu: tor’s sentencing recommendation in both the gun and drugs case and the domestic violence case were finalized on December 18, 2003. On that day, Shaw pled guilty and the fully signed plea agreements were filed in open court before a superior court judge different from the judge presiding over Shaw’s criminal cases.
On May 26, 2009, after two unsuccessful rounds of collateral state habeas litigation (called “personal restraint petitions” in Washington), Frost raised his Brady and Napue claims for the first time. Then Frost got new lawyers, federal public defenders in place of state criminal counsel. Frost’s third personal 'restraint petition was filed in state court after his- investigator at the Federal Public Defender’s Office reviewed Shaw’s criminal history and discovered the undisclosed plea agreement in the domestic violence case. Frost argued that the State knowingly elicited the false testimony of Shaw at trial and that the suppression of Shaw’s domestic violence plea agreement precluded him from impeaching Shaw’s credibility. The Washington State Supreme Court dismissed Frost’s five-year-old claims as time barred under Wash. Rev.Code § 10.73.090, Washington’s one-year time limit for petitioning for a “collateral attack on a judgment and sentence in a criminal, case.” It held that Frost, failed to meet the exception for “newly discovered evidence” because he had not acted with “reasonable diligence” in discovering the impeaching eyidence, which had been publicly available since December 18,2003.
On February 26, 2010J Frost filed an amended federal habeas petition and raised a number of grounds for relief, including for the first time here that he was denied due process under the Fourteenth Amendment when the State knowingly withheld material exculpatory evidence and that his Sixth and Fourteenth Amendment rights' were violated when the State knowingly elicited the false testimony of Shaw. On October 5, 2010, United States Magistrate Judge Brian A. Tsuchida issued a Report and Recommendation; which recommended that the district court deny Frost’s amended habeas petition. The Report ánd Recommendation concluded that Frost’s Brady and Napue claims were procedurally defaulted and should be dismissed for that reason.
*481 On February 4, 2011, United States District Judge Thomas S. Zilly adopted the Report and Recommendation and dismissed the habeas petition with prejudice. In addition, the district court denied a certificate of- appealability - as to Frost’s Brady and Napue claims.' Frost I, 2011 WL 486198 at *1-2. Likewise, our prior three judge panel and this en banc court denied Frost’s request- that we expand the certificate of appealability to address these issues. Frost II, 692 F.3d at 927 n. 3; Frost III, 757 F.3d at 919. As a result, Frost was not permitted to appeal the dismissal of . his Brady and Napue claims. Part II of today’s opinion now reverses course and expands the certificate of appealability to resuscitate these claims, concluding that “reasonable jurists could debate” whether the distinct court “was correct in its procedural ruling.” Maj. Op. at 474. I disagree.
Frost presents a classic case of procedural default. We do violence to principles of comity and federalism by failing to stand by our previous rulings. See Edwards v. Carpenter, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (“The procedural default doctrine and its attendant ‘cause and' prejudice’ standard are ‘grounded in concerns of comity and federalism.’”) (citing Coleman v. Thompson, 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)); see also Murray v. Carrier, 477 U.S. 478, 491, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).
II
Frost’s right to appeal the dismissal of his Brady and Napue claims “is governed by the certificate of appealability (COA) requirements 'now found" at 28 U.S.C. § 2253(c).” Slack v. McDaniel, 529 U.S. 473, 478, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Specifically, Frost is entitled to a COA on these issues only if he “has made a substantial showing of the denial' of a constitutional right.” 28 U.S.C. § 2253(c)(2). Frost “satisfies this standard- by demonstrating that jurists of reason could disagree with the district court’s resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.” Miller-El v. Cockrell, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).
However, 'the inquiry becomes “somewhat more complicated where, as here, the district court dismisses the petition on procedural grounds.”' Slack, 529 U.S. at 484, 120 S.Ct. 1595. In" such cases, the Supreme Court has instructed:
When the district court denies a habeas petition on procedural'grounds without reaching the prisoner’s underlying constitutional 'claim; a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and' that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.... Where a plain procedural bar is present and the district 'court-is' correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the 'petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted.
Id. (emphasis added);
‘ It follows that determining whether a COA should issue on Frost’s procedurally defaulted claims has two components, “one directed at [his] underlying constitutional claims and one directed at the district court’s procedural holding.” Id. at 484-85, 120 S.Ct. 1595. The Supreme Court has encouraged us to first resolve the proce *482 dural issues, especially if that inquiry would end the case. Id. at 485, 120 S.Ct. 1595. For this reason, I initially address the second component of the § 2253(c) inquiry, “whether jurists of reason could conclude that the [district [cjourt’s dismissal on procedural grounds was debatable or incorrect.” Id.
Ill
The district court dismissed Frost's Brady and Napue claims as procedurally defaulted. Frost I, 2011 WL 486198 at *1-2, adopting No. C09-725-TSZ-BAT, 2010 WL 5775657 at *4 (W.D,Wash. Oct. 5, 2010) (report and recommendation). More specifically, the district court found that Frost’s failure to raise these claims within one year after his judgment, as required by Washington law, provided an “independent and adequate state ground to bar habeas review.” Id.; see also Casey v. Moore, 386 F.3d 896, 920 (9th Cir.2004) (“We have already determined that this time-related procedural statute, Wash. Rev.Code § 10.73.090, provides an independent and adequate state ground to bar federal review.”). The district court’s decision was absolutely correct and, therefore, no further consideration on appeal is warranted.
A
To show- 'cause, Frost must show the existence of “some objective factor external to the defense [that] impeded counsel’s efforts to comply with the State’s procedural rule.” Murray, 477 U.S. at 488, 106 S.Ct. 2639. Frost fails to show that “the reason for his failure to develop facts in state-court proceedings was the State’s suppression of the relevant evidence.” Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004).
Frost provides no justification as to why he failed to raise his Brady and Napue claims during the five-and-a-half years between when Shaw’s plea deal was made publicly available and when he filed his third state habeas petition. How could he? The information was available on the public docket two days after the jury found him guilty in 2003. Frost fails to explain why he could not have raised these issues on direct appeal or in either of his first two state habeas petitions. While Frost may not have been able to raise his Brady and Napue claims before his conviction,' he could have done so in a timely post-conviction proceeding when the information became part of the public record. See McCleskey, 499 U.S. at 497, 111 S.Ct. 1454 (“That [petitioner] did not possess, or could not reasonably have obtained, certain evidence fails to establish cause if other known or discoverable evidence could have supported the claim in any event.”).
In fact, when Frost’s investigator finally got around to reviewing Shaw’s complete court files in 2009, he easily found Shaw’s domestic violence plea deal. The ease by which Frost’s investigator obtained the impeaching evidence trenchantly ■ demonstrates that. Frost could have brought his Brady and Napue claims as early as 2003 if he had conducted a “reasonable and diligent investigation.” Id. at 498, 111 S.Ct. 1454. His failure to do so does not constitute cause. See id.; see also Henry v. Ryan, 720 F.3d 1073, 1083 (9th Cir.2013) (no cause established when petitioner suspected and had evidentiary support for his Brady claim prior to federal habeas proceedings); Matthews v. Ishee, 486 F.3d 883, 891 (6th Cir.2007) (“Where, like here, ‘the factual basis for a claim’ is ‘reasonably available to’-the petitioner or his counsel from another source; the government is under no duty to supply that information to the defense.”) (quoting Strickler v. *483 Greene, 527 U.S. 263, 283 n. 24, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
Two Supreme Court cases Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), and Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), demonstrate why Frost has not established cause. In both Strickler and Banks, the Court held that cause existed after the prosecution withheld exculpatory evidence at trial and throughout state post-conviction proceedings. Strickler, 527 U.S. at 273-75, 119 S.Ct. 1936; Banks, 540 U.S. at 675, 124 S.Ct. 1256. In Strickler, the petitioner did not seek "discovery of possible exculpatory evidence because the prosecutor maintained an “open file policy,” which purportedly gave the petitioner access to all of the prosecutor’s files. 527 U.S. at 276-78, 119 S.Ct. 1936. The prosecution in Strickler then withheld investigative notes and letters that would have “cast serious doubt” on a key trial witness’s testimony, Id. at 273, 119 S.Ct. 1936. Similarly, in Banks, the State advised the defense that there “would -be no need to litigate discovery -issues,” because the State would “without the necessity' of motions, provide [the defense] with all discovery to which [the defense was] entitled.” 540 U.S. at 675, 124 S.Ct. 1256 (internal alternation omitted). However, the prosecution in Banks failed to disclose that an essential prosecution witness was a paid police informant and that another key witness had been intensively coached by prosecutors. Id.
Frost’s case is inapposite in, several important respects. First, unlike -the “long-suppressed evidence” in Strickler and Banks, the impeaching evidence Frost now. relies on was not suppressed during Frost’s postrconviction proceedings. Cf. Banks, 540 U.S. at 675, 124 S.Ct. 1256. Importantly, the prosecution never “assert[ed] during state habeas proceedings that [Frost] had already received everything known to the government.” Strickler, 527 U.S. at 289, 119 S.Ct. 1936; Banks, 540 U.S. at 692-93, 124 S.Ct. 1256. And unlike investigative notes or. memo-randa that are in the exclusive possession of the government, Shaw’s plea deals were part of the public record beginning in December. 2003 shortly after the,jury returned, its verdict against. Frost. Cf. Strickler, 527 U.S. at 273-75, 119 S.Ct. 1936. The State had no duty to provide this reasonably available information to Frost. See Matthews, 486 F.3d at 890-91. Finally, Frost knew during trial that Shaw had entered into an agreement for a re-ducéd sentence oh the gun and drugs charges in exchange for his testimony at Frost’s trial. • Frost says he suspected that the prosecution withheld information regarding its agreement with Shaw. If Frost would have reviewed Shaw’s plea deal in the gun and drugs case, he would have learned of Shaw’s domestic violence plea agreement. . His failure to do so “was his own failure, and not a failure caused by the [prosecution] or some other external factor.” Id. at 891.
The majority suggests that the King County Prosecutor’s Office deliberately withheld Shaw’s plea deals from Frost in 2008. The majority’s .brazen accusations are entirely unsupported by the record, and the letters between Frost and the Prosecutor’s Office tell a much different story than the majority strains to tell. Lest.there be any doubt on this issue, I discuss each letter exchanged between Frost and the King County Prosecutor’s Office in response to his subsequent public records requests. . .
On March 22, 2008, five years after his conviction, Frost first wrote to the Prosecutor’s Office to. request “any documents, statements, and/or reports that purtain [sic] to EDWARD G. SHAW.” The Public *484 Records Officer, Kelli Williams, promptly informed Frost on April 1, 2008, that she had “located four (4) case files for Edward G. Shaw that [she] believed [were] responsive to [Frost’s] request.” The letter provided Frost with the criminal charge and court case number associated with each of these four cases and offered to photocopy the complete case files at a cost of $195. Notably, Shaw’s domestic violence case was included in this list of cases. Frost declined to look at it.
On April 3, 2008, Frost wrote that he was “not looking for [Shaw’s] complete case files” and limited his request solely to documents “that could be used to ‘DETERMINE WHETHER OR NOT MR. SHAW HAS WORKED AS A STATE OR POLICE INFORMANT.’ ” [Emphasis in original] By letter dated April 14, 2008, Williams clarified that she was “unable to search [the] files by names of witnesses or informants” but she offered to search through any particular case files if Frost could provide her with the “police incident number” or “court cause number.”
By reply letter the next day, Frost further limited his public records request to just" two' case files: (1) documents contained in his own case file from his 2003 trial, and (2) documents contained' in Shaw’s gun and drugs case file. In this April 15 letter, Frost further narrowed his request to “statements given by Eddy Shaw” and “any and all King County Police Case Numbers brought up in those files.” On April 28, 2008, Williams wrote back to confirm her understanding of Frost’s now twice-amended records request for “Eddie Shaw’s statements and King County Sheriff (Police) case numbers” in the case files associated with Frost’s 2003 trial and Shaw’s gun and drugs case. Finally, oh May 8, 2008, Williams wrote Frost that she was able to locate “one statement of Eddie Shaw” in the gun and drugs ease file.
After receiving this last letter, Frost ceased all communication with the Prosecutor’s Office.' He does not explain-why he abandoned his search or why he declined to pay for copying to review any documents associated with Shaw’s domestic violence case. In addition; Frost provides no justification as to why he limited his request solely to Shaw’s police statements and declined to review Shaw’s plea deal in the gun and drugs case. If Frost had reviewed the gun and drugs plea' deal, he would have discovered Shaw’s domestic violence case referenced therein. It was certainly not hidden. While the majority tries to paint a nefarious picture of deliberate prosecutorial misconduct and complicity, the record currently before us instead tells a different story. It shows that the Prosecutor’s Office responded promptly and accurately to all of Frost’s record requests. It shows' that the Prosecutor’s Office offered to send Frost all of the documents- associated with Shaw’s criminal history, including Shaw’s plea deals in the gun and ‘drugs case and in the domestic violence case. Frost, however, declined to review these documents. Therefore, Frost has not shown cause to excuse his procedural default, and the majority errs by concluding otherwise.
B
But even if Frost could show cause, he certainly cannot show prejudice. To show prejudice for his Brady claim, Frost must show a “treasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.” Strickler, 527 U.S. at 289, 119 S.Ct. 1936. To show' prejudice for his Nwpue-claim, Frost must show a “reasonable likelihood that the false testimony could have affected the *485 judgment of the jury.” Sivak v. Hardison, 658 F.3d 898, 912 (9th Cir.2011) (internal citation and quotation omitted).
The majority agrees that Frost cannot show such prejudice. Maj. Op. at, 475-76. This is not surprising considering the evidence of guilt at Frost’s trial was overwhelming. Frost gave three taped confessions, all of which were entered into evidence at trial, and Frost testified in detail about his involvement in the eleven-day home invasion and commercial robbery spree. Further, as the majority observes, Shaw’s undisclosed plea deal in the domestic violence case added little impeachment value considering the jury was already informed that Shaw had received leniency from sentencing on other serious felonies in exchange for his testimony against Frost. Maj. Gp. at 475-76. The majority correctly, concludes that “there is no ‘reasonable likelihood’” that Shaw’s false testimony about only having one plea agreement could have ‘affected the judgment of the jury,’ ’’ and that “there is no ‘reasonable probability that the outcome [at Frost’s trial] would have been different” had the jury learned of Shaw’s second plea agreement, which had not yet been accepted by a different judge. Maj. Op. at 475.
In other words, the majority agrees that the district court’s dismissal of Frost’s Brady and Napue claims was correct. In these instances — “[w]here a plain procer dural bar is present and the district court is correct to invoke it to dispose of the case” — the Supreme Court has clearly instructed that “no appeal [is] warranted.” Slack, 529 U.S. at 484, 120 S.Ct. 1595. The majority’s decision to reverse our pri- or opinion and to now expand the COA only to deny these meritless claims is a blatant disregard of binding .Supreme Court precedent enforcing procedural bars and a lamentable waste of precious judicial resources.

IV

Section TI C of Judge Kozinski’s opinion launches a groundless, personal attack against named employees of the King County Prosecutor’s Office. Indeed, he has not garnered support from a majority of'the court to support-it. Section II C is hot the ruling of our en bane court; it is merely hortatory.
The Section accuses several King County employees of “professional misconduct,” providing “incorrect or misleading information,” and “stonewall[ing]” Frost. Op. at 477. Incredibly, no discovery has been conducted on these issues; nor has an evidentiary hearing taken place. That’s not surprising given' the undisputed fact that the claim was ruled procedurally defaulted. by both state and federal courts. Nonetheless, Judge- Kozinski engages in sheer speculation without any factual basis to support raw supposition. But what we do have in the record" thus far provides no support for this unwarranted assault. Sadly, Judge Kozinski elects himself finder of fact in order to hold the individuals “to account for their conduct” and then exhorts these individuals 'to “seek to clear their names” with the state bar. Op. at 476,478) ......
. The Section accuses Zachary Wagnild, the deputy prosecuting attorney, in Frost’s case and Shaw’s gun and drugs case, of willfully and deliberately withholding Shaw’s domestic violence plea agreement and permitting Shaw to lie on the stand. Op. at 476-77. It also accuses Gary Ernsdorff, the deputy prosecuting attorney in Shaw’s domestic violence ease, of engaging in complicity to keep Shaw’s domestic violence plea deal secret. Op. at 477.
*486 These reckless accusations are made without any knowledge of the actual facts. Section II C fails to consider the possibility that Wagnild did not know about Shaw’s domestic violence plea deal at the time of Frost’s trial or the possibility that Shaw’s plea deals were not signed or fully completed until entered in open court on December 18, 2003, after Frost’s trial. It is also likely that Shaw’s gun and drugs case and domestic violence case were handled by two different units in Washington State’s largest county prosecutor’s office, resulting in a classic case of “the left hand didn’t know what the right hand was doing.” The bottom line is, we just don’t know what happened. Yet, the Section automatically assumes the worst of these two King County prosecutors and, as a result, brands them with a scarlet letter.
Section II C also accuses Kelli Williams, a non-attorney Public Records Officer, of providing “incorrect or misleading information,” and declares Williams to be either incompetent, indolent, or deliberately deceptive. Op. at 477. Nonsense. As shown by the 2008 letters, Williams promptly and accurately responded to Frost’s record requests and offered to provide Frost with all of the information he needed. Williams may not have even known Wagnild or Ernsdorff or even been a King County employee at the time of Frost’s trial. It is highly likely that she had absolutely no prior knowledge of Frost’s case, especially considering that Frost’s public records request came five years after his conviction. Yet, once again, the author assumes the worst: that Williams deliberately hid “the deception committed by her office.” Op. at 477.
Ultimately, Section II C is used as a platform to offer the author’s “two-cents” on the supposed inner-workings of Washington’s criminal justice system. Along the way, the character and integrity of several public employees is tarnished. Thankfully, a majority of the court has refused to join in this indefensible and intemperate attack.
I respectfully dissent as to Part II of the majority opinion. I concur as to Part I and in the judgment denying habeas relief.